IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

QUINN CONKLIN,

        *Plaintiff,*

v.

DENIS MCDONOUGH, *Secretary of Veterans Affairs,*

        *Defendant.*

Civil Action No. 2:20-cv-2010

Hon. William S. Stickman IV

## MEMORANDUM OPINION

Plaintiff Quinn Conklin ("Conklin") filed an amended complaint ("Complaint") against Defendant Denis McDonough ("McDonough"), the current Secretary of the Department of Veteran Affairs, alleging two counts–a hostile work environment claim based on gender discrimination and a retaliation claim, both brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981 *et seq.* ("Title VII"). (ECF No. 29). Pending before the Court is McDonough's Motion for Summary Judgment ("Motion") as to both claims. (ECF No. 45). For the following reasons, McDonough's Motion is granted in its entirety.

## I.    FACTUAL BACKGROUND

At all relevant times, Conklin was employed as a pharmacy technician at the VA Butler Healthcare System ("Butler VA") in Butler, Pennsylvania. (ECF No. 47, ¶¶ 1–2); (ECF No. 58, ¶¶ 1–2); (ECF No. 29, ¶ 8). Conklin began working with William Dalmagro ("Dalmagro"), a pharmacist, in the Butler VA pharmacy in 2002. (ECF No. 47, ¶ 6); (ECF No. 58, ¶ 6). The two worked together for approximately eighteen years. (ECF No. 47, ¶¶ 6, 9); (ECF No. 58, ¶¶ 6, 9).

The only time that Dalmagro was Conklin's supervisor was in 2016. (ECF No. 47, ¶ 10); (ECF No. 58, ¶ 10); (ECF No. 60, ¶ 51); (ECF No. 63, ¶ 51).

Dalmagro oversaw pharmacy procurement and his position particularly "involved cost-containment issues and keeping prices low." (ECF No. 47, ¶ 11); (ECF No. 58, ¶ 11). He took this responsibility very seriously and is described as a "micromanager" when it came to these duties. (ECF No. 48-1, p. 18); (ECF No. 47, ¶ 165); (ECF No. 58, ¶ 165). As a result of his intensity, Dalmagro occasionally yelled at pharmacy staff, including Conklin, related to their job performance. (ECF No. 47, ¶¶ 146, 148, 157–58, 169–72); (ECF No. 58, ¶¶ 146, 148, 157–58, 169–72); (ECF No. 60, ¶ 16); (ECF No. 63, ¶ 16); (ECF No. 48-4, pp. 8, 10); (ECF No. 61-2, pp. 7–8, 12).

Throughout her tenure, Conklin was involved with procurement and ordering for the pharmacy, which put her and Dalmagro in weekly, if not daily, contact. (ECF No. 48-1, p. 15); (ECF No. 61-1, p. 6); (ECF No. 47, ¶¶ 8, 57); (ECF No. 58, ¶¶ 8, 57); (ECF No. 57, p. 12); (ECF No. 61-4, pp. 12–13). This was especially evident during her time as the lead pharmacy technician, where she was in charge of all ordering, subject to Dalmagro's oversight. (ECF No. 61-8, p. 5); (ECF No. 48-1, pp. 14–15).

The interaction between Dalmagro and Conklin that gave rise to this suit—what the parties refer to as the "big girl" incident—occurred on June 28, 2019. (ECF No. 60, ¶ 21); (ECF No. 63, ¶ 21). Conklin was tasked with placing an order for trach brushes for a patient. (ECF No. 48-3, p. 90); (ECF No. 48-4, p. 9); (ECF No. 61-2, p. 9). To place the order, she needed to know which brush size was needed, which was not listed on the request for the order. (ECF No. 48-3, p. 90); (ECF No. 48-4, p. 9); (ECF No. 61-2, p. 9). Conklin brought the order to Dalmagro asking what size was needed. (ECF No. 48-3, p. 90). Dalmagro became frustrated and told her different ways

to investigate on her own to figure out which size brush to order.  (*Id.*).  Conklin responded that

she did not know how to do this, which prompted Dalmagro to tell her that she "was a big girl"

and either "to take care of it" or "figure it out."  (ECF No. 47, ¶¶ 20–22); (ECF No. 58, ¶¶ 20–22);

(ECF No. 48-3, p. 90).

Conklin reported this interaction to Nick Curcio ("Curcio"), the facility harassment

prevention program coordinator and Equal Employment Opportunity ("EEO") investigator in July

2019.  (ECF No. 47, ¶ 15); (ECF No. 58, ¶ 15); (ECF No. 60, ¶ 21); (ECF No. 63, ¶ 21).  Curcio

then conducted a fact-finding investigation and concluded in his August 2, 2019, report that "there

is sufficient eyewitness testimony to conclude that Mr. Dalmagro did in fact harass Ms. Conklin

on 6/28/19 and has done so on other occasions."  (ECF No. 47, ¶¶ 16, 24); (ECF No. 58, ¶¶ 16,

24); (ECF No. 60, ¶¶ 22–23); (ECF No. 63, ¶¶ 22–23).  As a result, Dalmagro received professional

counseling by Nicole Fleeger ("Fleeger"), the chief of pharmacy at the time, in the presence of a

union representative.  (ECF No. 47, ¶¶ 26, 132); (ECF No. 58, ¶¶ 26, 132); (ECF No. 60, ¶ 26);

(ECF No. 63, ¶ 26).

In August 2019, Conklin applied for an inventory management specialist position in the

logistics department of the Butler VA.  (ECF No. 47, ¶¶ 29–30); (ECF No. 58, ¶¶ 29–30); (ECF

No. 60, ¶ 36); (ECF No. 63, ¶ 36).  On August 12, 2019, Conklin contacted the Department of

Veteran Affairs Office of Resolution Management ("ORM") complaining that Dalmagro had

subjected her to gender-based harassment from July 1, 2019, onwards.  (ECF No. 60, ¶ 33); (ECF

No. 63, ¶ 33).  Fifteen days later, Conklin learned that she was not selected for the position, and it

was instead given to a man working in the logistics department who was given veteran's

preference.  (ECF No. 47, ¶¶ 29–30); (ECF No. 58 ¶¶ 29–30); (ECF No. 60, ¶¶ 34, 38–39); (ECF

No. 63, ¶¶ 34, 38–39).  Conklin then filed a formal EEO complaint related to this non-selection on

December 6, 2019.  (ECF No. 47, ¶ 13); (ECF No. 58, ¶ 13); (ECF No. 60, ¶ 40); (ECF No. 63, ¶ 40).

In February 2020, Dalmagro was transferred to a different facility and after this, Conklin no longer worked with him face-to-face.  (ECF No. 47, ¶ 9); (ECF No. 58, ¶ 9).  However, the two continued to interact due to their respective procurement duties.  (ECF No. 47, ¶ 9); (ECF No. 58, ¶ 9); (ECF No. 60, ¶ 43); (ECF No. 63, ¶ 43).  Throughout 2020 and 2021, Conklin applied for other open positions in the Butler VA but did not receive an offer on any of them.  (ECF No. 47, ¶¶ 33–53); (ECF No. 58, ¶¶ 33–53).  Conklin only expressed her desire to transfer from the pharmacy to the EEO officer, not to anyone directly involved in the hiring process.  (ECF No. 47, ¶¶ 174–177); (ECF No. 58, ¶¶ 174–177).

Conklin filed a second formal complaint on January 10, 2022, alleging she was subjected to a hostile work environment because of an incident that occurred on September 16, 2021, where Conklin alleged that Dalmagro threatened to "ding" her and write her up.  (ECF No. 47, ¶ 66); (ECF No. 58, ¶ 66); (ECF No. 60, ¶ 48); (ECF No. 63, ¶ 48).  No disciplinary action against Conklin followed.  (ECF No. 47, ¶¶ 69, 71–72, 76); (ECF No. 58, ¶¶ 69, 71–72, 76).

Four months after Conklin filed her second EEO complaint, she applied for, was selected, and accepted the role of clinical pharmacy technician, a lower-graded position, in May 2022.  (ECF No. 47, ¶¶ 77–78, 90–92); (ECF No. 58, ¶¶ 77–78, 90–92); (ECF No. 60, ¶ 54); (ECF No. 63, ¶ 54).  Soon after, she contacted an EEO counselor and subsequently filed a formal complaint of discrimination because of her change to a lower grade.  (ECF No. 47, ¶¶ 81–83); (ECF No. 58, ¶¶ 81–83).  Her complaint was ultimately dismissed for failure to state a claim.  (ECF No. 47, ¶ 86); (ECF No. 58, ¶ 86).

Conklin continued to perform procurement duties as a clinical pharmacy technician five to six times per month, on average.  (ECF No. 47, ¶ 98); (ECF No. 58, ¶ 98).  Although she was not a lead procurement employee at this time, she was one of few individuals that could purchase for the pharmacy.  (ECF No. 47, ¶ 101); (ECF No. 58, ¶ 101).  Dalmagro reviewed all orders placed, which led him and Conklin to have continued interactions, though more limited in frequency and only electronically.  (ECF No. 47, ¶ 96); (ECF No. 58, ¶ 96); (ECF No. 60, ¶ 64); (ECF No. 63, ¶ 64).

In early 2023, Conklin applied to a wide variety of open positions with the Butler VA.  (ECF No. 47, ¶¶ 110–131); (ECF No. 58, ¶¶ 110–131).  She had varying degrees of success with her pursuits, where she was interviewed and offered the position for some and rejected for others.  (ECF No. 47, ¶¶ 110–131); (ECF No. 58, ¶¶ 110–131).  Ultimately, Conklin applied, was selected for, and accepted a fiscal accounting technician position at the Butler VA.  (ECF No. 47, ¶¶ 106–08); (ECF No. 58, ¶¶ 106–08); (ECF No. 60, ¶ 68); (ECF No. 63, ¶ 68).  This position was a lower grade than her role as a clinical pharmacy technician.  (ECF No. 47, ¶ 109); (ECF No. 58, ¶ 109); (ECF No. 60, ¶ 68); (ECF No. 63, ¶ 68).

On December 28, 2020, Conklin commenced this action against McDonough alleging claims for a hostile work environment based on gender discrimination and retaliation, both pursuant to Title VII.  (ECF Nos. 1, 29).

## II.    STANDARD OF REVIEW

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed.  *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must view the evidence presented in the light most favorable to the non-moving party. *Id.* at 255. It refrains from making credibility determinations or weighing the evidence. *Id.* "[R]eal questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof[]" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment." *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) (citation omitted).

### III.    ANALYSIS

McDonough argues that Conklin fails to state a *prima facie* case of a hostile work environment based on gender discrimination and retaliation in violation of Title VII. (ECF No. 46, p. 1). He requests that summary judgment be entered in his favor and against Conklin. (*Id.*). Conklin opposes McDonough's Motion asserting that there are genuine issues of material fact. (ECF No. 56, p. 1).

### A. Conklin has failed to establish a *prima facie* case for a hostile work environment.

At Count I of her Complaint, Conklin alleges a hostile work environment claim based on her gender. (ECF No. 29, ¶¶ 6–26). She alleges that beginning on or about June 27, 2019, and continuing through the present, she suffered harassment because of gender (1) during what the parties refer to as the "big girl" incident; (2) on numerous occasions where Dalmagro insulted her weight yet did not make similar comments to male employees who are also overweight; (3) when male coworkers were scolded for helping her with her job responsibilities; and (4) through Dalmagro's frequent yelling at her without justification. (*Id.* ¶ 10).

6

To prevail on a hostile work environment claim, a plaintiff must establish the following elements of the *prima facie* case: (1) she suffered intentional discrimination because of her gender; (2) the discrimination suffered was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person under similar circumstances; and (5) the existence of *respondeat superior* liability. *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (citation omitted). "[T]hese factors include both a subjective standard (No. 3) and an objective standard (No. 4)," that are used to establish that an employee was both subjectively and objectively harmed by the alleged hostile work environment. *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1483 (3d Cir. 1990); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993) (confirming that hostile work environment claims involve both a subjective and objective standard). In his Motion, McDonough argues that Conklin fails to meet the first, second, and fourth elements of the *prima facie* case. (ECF No. 46, pp. 3–4, 6).

In determining whether an environment is hostile, a court considers the totality of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Castleberry*, 863 F.3d at 264 (quoting *Harris*, 510 U.S. at 23). Thus, the "discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Andrews*, 895 F.2d at 1484. The Court is also mindful that "offhanded comments, and isolated incidents (unless extremely serious)" are generally not sufficient to sustain a hostile work environment claim. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Rather, the "conduct must be extreme to amount to a change in the terms and conditions of employment...." *Id.*

1. Conklin was not intentionally discriminated against because of her gender.

McDonough asserts that Conklin cannot establish that she was discriminated against on the basis of her gender because the allegations concerning Dalmagro's conduct, apart from one interaction, did not cite "any incidents where Dalmagro made any disparaging remarks referencing gender in her presence or to her directly." (ECF No. 46, p. 4). McDonough also contends that Conklin fails to provide evidence of a connection between her gender and Dalmagro's treatment of her, such as evidence of him treating other employees more favorably because they were males. (*Id.*); (ECF No. 62, p. 2). He points out that throughout the record, Conklin has admitted numerous times that Dalmagro also corrected and yelled at male employees. (ECF No. 62, pp. 3–4).

Conklin does not point to direct evidence of discrimination. Instead, she argues that the entirety of the record shows that Dalmagro's harassing conduct towards her was based on gender.[1] (ECF No. 57, p. 5). Conklin points to her own deposition where she stated that she could not recall a time when Dalmagro yelled at men the way he yelled at her, that she never knew Dalmagro to require male coworkers to fix errors, and that both she and Ekas discussed in their depositions "that Dalmagro treated all female staff of the pharmacy poorly and identified a number of woman [sic] at whom Dalmagro had yelled and screamed." (*Id.*). Based on this, Conklin contends that the Court should find that there is a genuine issue of material fact as to whether Dalmagro's conduct was based on her gender. (*Id.*).

For a hostile work environment claim to survive summary judgment, a plaintiff must present "sufficient evidence to give rise to an inference of discrimination by offering proof that

---

[1] Typically, when a plaintiff seeks to establish discrimination through circumstantial rather than direct evidence, as Conklin does here, the *McDonnell Douglas* burden-shifting framework applies. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This framework, however, does not apply in hostile work environment claims. *Hanafy v. Hill Int'l, Inc.*, 669 F. Supp. 3d 419, 432 (E.D. Pa. 2023) (collecting cases).

her 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 278–79 (3d Cir. 2001) (quoting *Harris*, 510 U.S. at 21).  In light of this, "[i]t is only necessary to show that gender is a substantial factor in the discrimination, and that if the plaintiff 'had been a man she would not have been treated in the same manner.'" *Tomkins v. Pub. Serv. Elec. & Gas Co.*, 568 F.2d 1044, 1047 n.4 (3d Cir. 1977) (citation omitted).  A similar consideration is whether "'[i]ntimidation and hostility toward women because they are women'" occurred. *Andrews*, 895 at 1485 (citation omitted).  "[T]he pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment." *Id.* (citations omitted).

Based on the record before it, the Court does not find that Conklin's gender was a substantial factor that led to Dalmagro's conduct.  First, the record fails to establish a genuine issue of material fact that Conklin was discriminated based on her gender during the "big girl" incident. Conklin affirmed both during the EEO's factfinding investigation and in her response to McDonough's concise statement of material facts "that Mr. Dalmagro told her that she 'was a big girl [and] to take care of it.'"  (ECF No. 47, ¶ 20); (ECF No. 58, ¶ 20).  Conklin asserts that Dalmagro said this with disgust and was referencing her weight.  (ECF No. 58, ¶ 22).  Dalmagro contends that his comment was "you are a big girl, so figure it out," and was said in regard to Conklin "being an adult and needing to do her job," specifically for her to investigate on her own which size trach brush needed to be ordered.  (ECF No. 48-3, p. 90); (ECF No. 47, ¶¶ 21–22); (ECF No. 58, ¶¶ 21–22).  Even though the parties dispute the context of Dalmagro's remark, there is no genuine issue of *material* fact as to it.  Regardless of Dalmagro's intent, a jury could not

reasonably find that Conklin's gender was the motivating factor for his comment. The record demonstrates that Dalmagro's remark was motivated by frustration and wanting Conklin to figure out what size trach brush was needed, which he believed she was capable of doing on her own.

Second, Conklin points to Dalmagro's conduct toward not only her, but also Ekas and the female pharmacy staff as a whole. As to Conklin and Ekas individually, both described their job functions as being heavily involved in, if not the person in charge of, procurement for the pharmacy. (ECF No. 48-14, p. 4); (ECF No. 61-8, p. 5). Dalmagro oversaw ordering and procurement, and his primary responsibilities were "cost-containment issues and keeping prices low." (ECF No. 47, ¶ 11); (ECF No. 58, ¶ 11). The record demonstrates that he carried out these objectives with a certain intensity and seriousness, and because of this, it led to the unpleasant encounters that Conklin and Ekas recount. However, such interactions occurred because of and related to their job performance with regard to pharmacy procurement and were not motivated by gender.[2]

Considering the other female pharmacy staff, the record also does not present evidence that raises an inference of discrimination. Conklin has repeatedly admitted that Dalmagro yelled at and corrected male employees in the pharmacy, although she asserts that two of these incidents occurred because the male employees helped her with a task.[3] The record shows that Dalmagro

---

[2] The following testimony illustrates the context in which Dalmagro would allegedly harass the two women. "Because [Dalmagro] would come over and, you know, tell me about my work, and he would come over and yell at me or scold me over what I was ordering." (ECF No. 48-4, p. 29); (ECF No. 61-2, p. 49). "He was constantly yelling at [Ekas] over the strip pro and other purchasing duties." (ECF No. 48-4, p. 32); (ECF No. 61-2, p. 57).

[3] "David Gaydosh was corrected by Mr. Dalmagro for errors." (ECF No. 47, ¶ 167); (ECF No. 58, ¶ 167). "Plaintiff witnessed Mr. Dalmagro correct Patrick Pellegrino before." (ECF No. 47, ¶ 168); (ECF No. 58, ¶ 168). "Mr. Dalmagro yelled at Matt Benford previously." (ECF No. 47, ¶ 170); (ECF No. 58, ¶ 170). "Plaintiff witnessed Mr. Dalmagro yelling at former pharmacy manager Jonathan Klemens." (ECF No. 47, ¶ 171); (ECF No. 58, ¶ 171). "Plaintiff witnessed Mr. Dalmagro yell at Francis Balog (male)." (ECF No. 47, ¶ 172); (ECF No. 58, ¶ 172). "Q: You

had ongoing staff interaction issues which were not specific to employees' gender.  (*See* ECF No. 47, ¶ 146); (ECF No. 58, ¶ 146); (ECF No. 60, ¶ 16); (ECF No. 63, ¶ 16).

For these reasons, Conklin fails to meet the first prong of her hostile work environment claim.

> ## 2.  Even if Dalmagro's conduct was intentionally discriminatory, it was neither severe nor pervasive.

McDonough contends that Conklin fails to establish the second element because she and Dalmagro first began working together in 2002, yet Conklin did not allege that Dalmagro harassed her until at least eight years later.  (ECF No. 62, p. 5).  McDonough also argues that Dalmagro's comments about "dinging" Conklin do not amount to severe or pervasive conduct because Conklin admitted that Dalmagro was not her supervisor, she was unsure whether he had the ability carry out his threats, and she ultimately was not subjected to any adverse employment action.  (ECF No. 46, p. 5); (ECF No. 62, p. 6).  McDonough asserts that Dalmagro's comment about Conklin being a "big girl" and admonishments he gave related to work performance do not demonstrate the severity or pervasiveness required to create an abusive working environment.  (ECF No. 46, p. 5); (ECF No. 62, p. 7).

In response, Conklin highlights that although she did not complain about Dalmagro's conduct to the EEO until 2019, she notified her supervisors "on a number of occasions from 2009 or 2010 to 2018" regarding her interactions with Dalmagro.  (ECF No. 57, p. 7).  As to McDonough's second argument, Conklin argues that her position as a technician was subordinate to Dalmagro's in practice, even though not technically on an organizational chart, and because of

---

heard Bill [Dalmagro] correct Patrick [Pellegrino] before [the big girl incident]; correct?  A: Yes." (ECF No. 48-4, p. 9); (ECF No. 61-2, p. 10).  "Q: Okay.  But you have seen [Dalmagro] yell at men; correct?  A: Yes or correct them."  (ECF No. 48-4, p. 13); (ECF No. 61-2, p. 23).

this, she feared his threatened actions could have a negative effect on her employment. (*Id.* at 9). Conklin addresses McDonough's final argument by pointing to the EEO investigator's report which concluded that Dalmagro harassed Conklin prior to the incident where he called her a "big girl" and that she estimated numerous times that Dalmagro yelled and screamed at her after this report was issued. (*Id.* at 7–8).

Conduct is severe or pervasive when a plaintiff shows that her workplace was "permeated" with discriminatory behavior "that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Peace-Wickham v. Walls*, 409 F. App'x 512, 519 (3d Cir. 2010) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)). Title VII is not a general civility code, and it does not guarantee an ideal workplace, *Fichter v. AMG Res. Corp.*, 528 F. App'x 225, 231 (3d Cir. 2013), nor does it encompass the ordinary trials and tribulations of the workplace. *Stucke v. City of Philadelphia*, 685 F. App'x 150, 154 (3d Cir. 2017). "Offensive conduct that renders an employee's work[-]life unpleasant or uncomfortable is insufficient." *Williams v. Pa. Hum. Rels. Comm.*, No. 14-1290, 2016 WL 6834612, at *21 (W.D. Pa. Nov. 21, 2016) (citation omitted). Allegations properly described as petty slights, minor annoyances, and simple lack of good manners do not suffice to establish an actionable hostile work environment claim. *Yarnall v. Phila. Sch. Dist.*, 57 F. Supp. 3d 410, 433 (E.D. Pa. 2014) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Accordingly, "[t]he threshold for pervasiveness and regularity of discriminatory conduct is high." *Greer v. Mondelez Glob., Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014). For pervasiveness specifically, the evidence must show that incidents of harassment occurred either in concert or with regularity. *Williams*, 2016 WL 6834612, at *21 (citation omitted).

Dalmagro's behavior does not meet the high burden of this prong. First, the record shows that his behavior was not regular. Conklin provided numerous estimations of how often Dalmagro yelled at her.[4] But given the weekly, if not daily, interaction the two had, these approximations do not rise to the level of pervasiveness. Additionally, the record demonstrates a number of situations where Dalmagro was visibly frustrated with, and resorted to yelling at, multiple employees in the pharmacy. The incidents described, however, were isolated events, related to mistakes made in the ordinary course of business.[5] Put another way, there were events that triggered Dalmagro's outbursts, thus couching them within discrete incidents and not regular, pervasive occurrences. The record demonstrates that these distinct mishaps, coupled with Dalmagro's intensity for his position, led to unpleasant and uncomfortable interactions with his co-workers.

Additionally, Conklin's reliance on Curcio's investigative findings does not satisfy this element. Even though Curcio found that Dalmagro harassed Conklin "on other occasions," this does not speak to the frequency in which such harassment occurred throughout the roughly twenty years they have worked together in some capacity. (ECF No. 48-3, p. 125). Therefore, even if Dalmagro's conduct was intentionally discriminatory, which the Court does not find, there is

---

[4] Conklin recounts that Dalmagro "yelled and screamed" at her "approximately a dozen different times during the period of August 2019 through February 2020." (ECF No. 60, ¶ 27); (ECF No. 48-4, p. 29); (ECF No. 61-2, p. 48). After Dalmagro relocated to New Castle Road in February 2020, Conklin estimates that Dalmagro "yelled and screamed" at her at least eighteen additional times. (ECF No. 60, ¶ 45); (ECF No. 48-4, p. 29); (ECF No. 61-2, p. 48).

[5] In addition to the specific interactions Conklin and Dalmagro had, the record also detailed instances where Dalmagro confronted other employees about mistakes or errors: "Q: What specifically is Nadine [Petinaci] aware of with regards to your case? A: I remember coming to the front because Bill [Dalmagro] was yelling at her, and she was in tears.... Q: What was the context of? A: Because of something she spilled on the line." (ECF No. 48-4, p. 8); (ECF No. 61-2, pp. 7–8). "A: Kathy Burroughs was yelled at as well by Bill Dalmagro; corrected and yelled at.... A: She would just tell me how he would treat her and yell at her over something she did was wrong." (ECF No. 48-4, p. 10); (ECF No. 61-2, p. 12).

nothing in the record that creates a genuine issue of material fact that such conduct was severe or pervasive, and thus Conklin fails to meet the second prong.

### 3. Dalmagro's conduct detrimentally affected Conklin.

The third element of the *prima facie* case is a subjective standard, and it is intended to "demonstrate[] that the alleged conduct injured this particular plaintiff giving her a claim for judicial relief." *Andrews*, 895 F.2d at 1483. The parties do not dispute that Conklin subjectively suffered harm as a result of Dalmagro's conduct. The Court also finds that Conklin has established this element as evidenced by her post-traumatic stress disorder diagnosis and multiple incidents of being brought to tears by Dalmagro. (ECF No. 60, ¶¶ 28, 46) (ECF No. 63, ¶¶ 28, 46). Accordingly, Conklin was subjectively affected by Dalmagro's conduct.

### 4. Dalmagro's conduct would not detrimentally affect a reasonable person of the same sex in the same position.

Under the fourth factor, McDonough argues that Conklin complains of "one mere offensive utterance," which he contends cannot alone serve as the basis for her claim. (ECF No. 46, pp. 6–7). Looking specifically at the other incidents Conklin cites, McDonough also asserts that they "pertain to both her male and female colleagues" and thus similarly cannot serve as the basis for a claim of a hostile work environment. (*Id.* at 7).

Conklin responds arguing that apart from her own interactions with Dalmagro, Ekas—who Conklin contends was subjected to the same type of abuse from Dalmagro—ultimately resigned, in part, because of his conduct. (ECF No. 57, pp. 9–10). This, Conklin asserts, supports a finding that Dalmagro's conduct would detrimentally affect a reasonable person of the same protected class in the same position. (*Id.* at 10). In his reply, McDonough argues that Conklin relying on Ekas's testimony, without more, is not enough to satisfy this element. (ECF No. 62, p. 8).

In contrast to the third element, this element requires an objective inquiry. It functions to "protect[] the employer from the 'hypersensitive' employee, but still serve[] the goal of equal opportunity by removing the walls of discrimination that deprive women of self-respecting employment." *Andrews*, 895 F.2d at 1483. Thus, when looking at all the alleged incidents as a whole, a district court must consider whether "they produce a work environment hostile and offensive to women of reasonable sensibilities." *Id.* at 1486.

Even though Dalmagro's actions were unpleasant and subjectively affected Conklin, the record does not demonstrate that the environment allegedly created by his conduct met this standard. Conklin cannot rely on Ekas's testimony alone. Conklin explains that Ekas left the pharmacy "*at least in part*" due to Dalmagro's treatment of her. (ECF No. 57, p. 10) (emphasis added). Reading this in a light most favorable to Conklin, a jury could reasonably find that Dalmagro's conduct was at least a partial motivating factor leading to Ekas's departure. However, this alone and nothing more is insufficient and does not create a genuine dispute of material fact. Conklin presents this one example and no others. Additionally, as discussed related to the first factor, both Conklin's and Ekas's procurement duties caused them to have more interaction with Dalmagro than other pharmacy staff because he oversaw all ordering. When Dalmagro corrected or yelled at Conklin and Ekas, it was related to their performance in the area over which Dalmagro oversaw, i.e., procurement, and was not motivated by their gender. Thus, given the particular nature of both Conklin's and Ekas's procurement roles in the pharmacy and, consequently, their greater interaction with Dalmagro, the Court does not find that a woman of reasonable sensibilities would find the environment to be hostile and offensive to them because of their gender.

     5.   *Respondeat superior* liability has not been established.

Under the last factor, to determine whether an employer is liable for a hostile work environment under Title VII, a district court "look[s] to agency principles for guidance." *Andrews*, 895 F.2d at 1486 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986)). "[L]iability exists where the defendant knew or should have known of the harassment and failed to take prompt remedial action." *Id.* (citation omitted). An employer's efforts need not be effective, rather, their measures will be "adequate" if "reasonably calculated" to end the harassment. *Knabe v. Boury Corp.*, 114 F.3d 407, 412–13 (3d Cir. 1997). Moreover, the outcome of the actions is not the focus of the Court's inquiry. *See id.*

The Court finds that Conklin has not satisfied this element. As a preliminary matter, because the record fails to demonstrate that Dalmagro engaged in intentionally discriminatory behavior, there is no harassment that McDonough knew or should have known of to then respond promptly to thereafter. Even if the conduct was found to raise the requisite inference of discrimination, the record does not establish employer liability. First, while the parties agree that Conklin filed Reports of Contact related to her encounters with Dalmagro in 2018, there is no evidence in the record that indicates who these forms were submitted to, who was made aware of the completed reports' existence and their contents, and what requisite action, if any, was to be taken upon the completion of these reports. (ECF No. 60, ¶¶ 19–20); (ECF No. 63, ¶¶ 19–20).

The record also does not establish that even if management knew of Dalmagro's alleged harassing behavior toward Conklin, they failed to take prompt remedial action. Conklin cites one instance where she allegedly told management, specifically Francis Balog, that Dalmagro was "yelling and screaming at her and talking to her in a degrading manner" in late 2009 or early 2010. (ECF No. 60, ¶ 14); (ECF No. 63, ¶ 14). The parties dispute whether this occurred, and there are

no allegations or any supporting evidence offered in the record that if Conklin conveyed this to Balog, he then failed to take prompt, remedial action.

Conklin's contentions pertaining to Fleeger fail for similar reasons.  The parties dispute whether Fleeger knew that Conklin did not want to order anymore and instead wanted transferred from the pharmacy, both as a result of her issues with Dalmagro after the "big girl" incident.  (ECF No. 57, p. 15); (ECF No. 61-6, p. 7); (ECF No. 61-7, p. 2); (ECF No. 48-3, p. 61).   Regardless of the extent of Fleeger's knowledge, there are no allegations nor any evidence in the record that Fleeger was in the position to take the remedial action Conklin requested.  Additionally, the record demonstrates that Conklin did not voice her need to be transferred to anyone with the authority to do so.  (ECF No. 47, ¶¶ 174–178); (ECF No. 58, ¶¶ 174–178).

The Court's conclusion is further bolstered by what occurred as a result of Conklin officially reporting the "big girl" incident.  After Conklin reported the interaction to the EEO investigator, Curcio, management was made aware of Dalmagro's behavior and responded promptly at the conclusion of the EEO's fact-finding investigation by having Fleeger verbally counsel Dalmagro in the presence of a union representative.  (ECF No. 47, ¶¶ 15, 25–26); (ECF No. 58, ¶¶ 15, 25–26); (ECF No. 60, ¶¶ 21, 26); (ECF No. 63, ¶¶ 21, 26).  This demonstrates that management sought to take reasonable remedial action within the context of the issue that they were aware.

Conklin's allegations—that the counseling was unsuccessful because Dalmagro continued to yell and scream at her afterwards—do not establish this element.  The record fails to demonstrate that the employer's efforts following the "big girl" incident were not "reasonably calculated" to end the alleged harassing behavior.  *Knabe*, 114 F.3d at 412–13.  Although Conklin wanted to be moved from the pharmacy and voiced this as part of the HPP/EEO process in July and August

2019, this is the outcome Conklin wanted, not what is required by an employer to be in compliance with Title VII. (ECF No. 57, p. 15). *Respondeat superior* liability has thus not been established.

Therefore, considering the totality of the circumstances, the Court does not find that any conduct by pharmacy employees or superiors created a hostile work environment. The statements at issue here fall far short of Title VII's demanding standards, and their sporadic nature does not evidence a pervasively hostile work environment that functionally altered Conklin's conditions of employment. No reasonable jury could conclude that Conklin was subjected to a hostile work environment in violation of Title VII.

### B. Conklin has failed to establish a *prima facie* case for a Title VII retaliation claim.

At Count II of her Complaint, Conklin alleges a retaliation claim. (ECF No. 29, ¶¶ 27–59). Conklin contends that she was retaliated against in the forms of: (1) a constructive demotion from her position as a clinical pharmacy technician to fiscal accounting technician; (2) non-selection for the inventory management specialist position in August 2019; (3) employer failure to take effective remedial action to prevent Dalmagro's continued harassment after he received counseling; and (4) the requirement that Conklin must continue to work directly with Dalmagro. (ECF No. 57, p. 13). McDonough asserts that Conklin cannot establish a *prima facie* case for retaliation. (ECF No. 46, p. 9).

When a plaintiff proceeds on indirect evidence, the *McDonnell Douglas* burden-shifting framework applies. *See Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017) (applying the *McDonnell Douglas* burden-shifting framework to Title VII retaliation case). Under this framework, the plaintiff carries the initial burden and must establish a *prima facie* case of retaliation that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her

participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

If the plaintiff satisfies this initial showing, the burden of production then "shifts to the employer to provide a legitimate non-retaliatory reason for its conduct." *Carvalho-Grevious*, 851 F.3d at 257 (citing *Moore*, 461 F.3d at 342). If established, the burden then shifts backs to the employee "to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Moore*, 461 F.3d at 342 (citation omitted). "To survive a motion for summary judgment in the employer's favor, a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions." *Id.* (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

> 1. <u>Conklin engaged in a protected activity.</u>

To show she engaged in a protected activity, a plaintiff can point to informal protests of discriminatory employment practices, which include complaints made to upper management. *Id.* at 343 (citation omitted). The message rather than the means of conveyance is crucial to a finding of protected activity. *Id.* (citation omitted). To that extent, protected activity occurs where a plaintiff complains about alleged discrimination in a manner where it is possible for management to discern from the context of the statement that the employee is opposing unlawful conduct. *Sabo v. UPMC Altoona*, 386 F. Supp. 3d 530, 555 (W.D. Pa. 2019) (citation omitted). The parties do not dispute that Conklin engaged in protected activities, specifically her filing of administrative EEOs describing the behavior she opposed. (ECF No. 46, p. 10); (ECF No. 57, p. 13). The Court concurs, and thus the first element is satisfied.

> 2. <u>Conklin suffered an adverse employment action, specifically in her non-selection for the inventory management specialist position.</u>

Adverse employment actions are those that are "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. SEPTA*, 796 F.3d 323, 327 (3d Cir. 2015) (citation omitted). "An adverse employment action can generally be demonstrated by a hiring, firing, failure to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Greer v. Mondelez Glob., Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 749 (1998)). McDonough concedes that Conklin suffered adverse action after her EEOC filing, specifically her non-selection for applied job positions, but he does not address Conklin's other proposed forms of adverse employment action. (ECF No. 46, p. 10). The Court finds, as discussed below, that none of these other theories sufficiently establish this element.

a. *Constructive demotion*

The first theory Conklin puts forward is that she was constructively demoted when she went from her position as a clinical pharmacy technician to fiscal accounting technician. "[The Court of Appeals for the] Third Circuit has not explicitly held that 'constructive demotion' is a viable adverse employment action," however, it has "intimated that constructive demotion could be cognizable in the employment discrimination context." *Nicholson v. Petco Animal Supplies Stores, Inc.*, 409 F. Supp. 3d 323, 332 (M.D. Pa. 2019) (citing *Clark v. Township of Falls*, 890 F.2d 611, 618–19 (3d Cir. 1989)). The district court in *Nicholson v. Petco Animal Supplies Stores, Inc.*, 409 F. Supp. 3d 323, 332 (M.D. Pa. 2019), relied on cases from other circuits to analyze the motions for summary judgment on an age discrimination and retaliation claim. The district court found that "[c]onstructive demotion is no less adverse than actual demotion," such that "employers should not be permitted to create conditions that force an employee to accept a lower position." *Id.* It also reasoned that a constructive demotion should not be any more tolerable than a

20

constructive discharge, where in the discharge context, employers "are barred from creating conditions that cause an employee to involuntarily 'resign.'" *Id.* The analysis thus turned on whether the demotion was not "truly voluntary." *Id.* at 333 (citation omitted). The district court held that a reasonable juror could infer that based on the circumstances, the plaintiff's "only options were demotion or unemployment" and accordingly there was a genuine dispute of material fact regarding the voluntariness of the decision. *Id.*

While the Court is not bound by the district court's holding,[6] it agrees with its logic and application. However, the Court reaches a different conclusion and finds that the record here fails to establish the same genuine issue of material fact as to Conklin's change in position. The circumstances do not reasonably demonstrate that Conklin was presented the same sort of ultimatum as the plaintiff in *Nicholson*.

Transferring from the higher-graded clinical pharmacy technician position to the lower-graded fiscal accounting technician position was not the first time that Conklin accepted a lower-grade position during her tenure at the Butler VA. In May 2022, Conklin applied and was selected for a GS-7 clinical pharmacy technician, which was a lower grade than the GS-8 role she held until that time. (ECF No. 47, ¶¶ 4, 60–63, 78, 90–92); (ECF No. 58, ¶¶ 4, 60–63, 78, 90–92). Conklin admits that her decision to take this job was due to an ongoing discussion with her husband as to whether they could financially handle the decrease in her salary. (ECF No. 48-4, p. 6); (ECF No. 61-2, p. 5).

---

[6] The Third Circuit has held that district court decisions are not binding on other district courts within the district. *Threadgill v. Armstrong World Indus., Inc.*, 928 F.2d 1366, 1371 (3d Cir. 1991); *see also Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (quoting 18 James W. Moore et al., *Moore's Federal Practice* § 134.02[1][d] (3d ed. 2011)); *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 395 (3d Cir. 2017).

After accepting the position of clinical pharmacy technician, Conklin made initial contact with an EEO counselor in June 2022 about her change to a lower grade position and filed a formal EEO complaint regarding this the following month. (ECF No. 47, ¶¶ 81–82); (ECF No. 58, ¶ 81–82). In the ORM's September 30, 2022, notice of dismissal of the complaint, it found that Conklin "voluntarily accepted a change to a lower-graded position and has failed to demonstrate harm to a term or condition of employment, as she applied and for was selected for the position." (ECF No. 48-10, p. 3).

The Court applies the same rationale to Conklin's argument here regarding her change from a GS-7 to a GS-6 position, and does not find an appreciable difference between the two transfers.   Conklin voluntarily applied and was selected for the fiscal accounting technician position in early 2023.  (ECF No. 47, ¶¶ 106–08); (ECF No. 58, ¶¶ 106–08).  Prior to her selection, Conklin applied for a number of positions within the VA during the same time period, ranging in grades GS-5 to GS-7.  (ECF No. 48-8, pp. 41–49).  Thus, in her efforts to leave the pharmacy in early 2023, Conklin only applied for positions with the same grade or lower.  As the record shows, however, Conklin previously applied for higher grade positions, specifically two that were grade GS-9 in 2019 and 2020.  (ECF No. 48-1, pp. 20–21); (ECF No. 61-1, pp. 11–15); (ECF No. 47, ¶¶ 29, 33); (ECF No. 58, ¶¶ 29, 33).  Accordingly, there is no genuine issue of material fact that Conklin chose to apply only for lower grade positions and thus Conklin was not constructively demoted.

b. *Non-selection for inventory management specialist position*

Conklin's second theory asserts that she suffered an adverse employment action when she was not selected for the inventory management specialist position. McDonough concedes that her non-selection was an adverse employment action. (ECF No. 46, p. 10). The Court agrees. Conklin has satisfied the second element of her retaliation claim based on this theory.

c. *Employer failure to take remedial action after Dalmagro received counseling*

Conklin sets forth a third theory contending that McDonough failed to take remedial action after Dalmagro's counseling for the "big girl" incident. As discussed above under the *respondeat superior* prong of Conklin's hostile work environment claim, an employer violates Title VII if they knew or should have known of the alleged harassment and thereafter failed to take prompt remedial action. *Andrews*, 895 F.2d at 1486. Conklin asserts that the counseling Dalmagro received in August 2019 as a result of the "big girl" incident did not remedy the harassment, and because of this, McDonough allowed the alleged abuse to continue. (ECF No. 57, p. 15).

Conklin contends that Dalmagro yelled and screamed at her "approximately a dozen different times" immediately following the counseling in August 2019 through February 2020. (ECF No. 60, ¶ 27). After Dalmagro relocated to New Castle Road in February 2020, Conklin estimates that he yelled and screamed at her at least eighteen times. (ECF No. 60, ¶ 45). There is no evidence in the record that anyone else in the pharmacy was aware of these numerous interactions, either through first-hand knowledge or Conklin recounting them. Rather, the only occurrence that Conklin formally complained of was Dalmagro's alleged threat to "ding" her in September 2021, which was subsequently dismissed by the ORM for failure to state a claim. (ECF No. 47, ¶¶ 67–68); (ECF No. 58, ¶¶ 67–68); (ECF No. 48-9).

Accordingly, the record shows that McDonough did not fail to take prompt remedial action. Conklin did not make anyone aware of what was allegedly occurring with Dalmagro and no testimony in the record shows that anyone in the pharmacy knew of the alleged continued harassment. Thus, there is no genuine issue of material fact that McDonough failed to take prompt remedial action thereafter. Conklin's retaliation claim cannot proceed upon this theory of adverse employment action.

### d.  *Continued working directly with Dalmagro*

Conklin's final theory alleges that she suffered an adverse employment action by being forced to continue to work directly with Dalmagro.  The Court does not find that the record sufficiently demonstrates this.  The parties agree that ordering and procurement were included to some degree in each of the positions Conklin held within the pharmacy—narcotic pharmacy technician, lead pharmacy technician, and clinical pharmacy technician.  (ECF No. 47, ¶ 57); (ECF No. 58, ¶ 57); (ECF No. 57, p. 12).  As such, Conklin's speculation, without more, does not demonstrate that Fleeger forced Conklin to continue to order because of the case she filed.  (*See* ECF No. 47, ¶ 97); (ECF No. 58, ¶ 97).  Rather, a reasonable jury could find that Conklin continued to order because she had extensive experience doing so, a new employee transitioned into the role of lead procurement technician and went on maternity leave a few months later, and Conklin was only one of three employees (one of which went on maternity leave) that had a purchasing card in the pharmacy.  (ECF No. 47, ¶¶ 56, 93–94, 101); (ECF No. 58, ¶¶ 56, 93–94, 101); (ECF No. 48-1, p. 23); (ECF No. 48-8, pp. 25–26); (ECF No. 61-3, p. 9).  Accordingly, the Court does not find that a jury could reasonably determine that this theory demonstrates an adverse employment action on which Conklin's retaliation claim can proceed.

3. Conklin fails to establish the requisite causality between her protected activity and the adverse employment action she suffered.

To show causation, a plaintiff must produce evidence "sufficient to raise the inference that her protected activity was the *likely reason* for the adverse [employment] action." *Carvalho-Grevious*, 851 F.3d at 259 (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)). The overall inquiry is focused on the totality of the circumstances, which tends to show the required inference. *Id.* "Whether a causal link exists 'must be considered with a careful eye to the specific facts and circumstances encountered.'" *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 258 (3d Cir. 2014) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5 (3d Cir. 2000)). There must be sufficient evidence "that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 196 (3d Cir. 2015).

A plaintiff may show causation in any of the following three manners: (1) by the timing of the adverse action in relation to the protected activity; (2) by a pattern of animus during the interval between the protected activity and the adverse action; or (3) through other circumstantial evidence concerning the employer's motivation. *Theriault v. Dollar Gen.*, 336 F. App'x 172, 175 (3d Cir. 2009). Thus, the causation element requires "an inquiry into the motives of an employer, [and] is highly context-specific." *Kachmar*, 109 F.3d at 178. A plaintiff may accordingly rely on "a broad array of evidence" to prove a causal link between protected activity and adverse action. *Farrell*, 206 F.3d at 284.

"[I]t is causation, not temporal proximity itself, that is an element of [a] plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." *Kachmar*, 109 F.3d at 178. A plaintiff "may rely solely on temporal proximity between the protected conduct and the adverse action to create an inference of causation, but only

if the timing is 'unusually suggestive' of a retaliatory motive." *Daniels*, 776 F.3d at 196 (citations omitted); *see also Farrell*, 206 F.3d at 279 (stating that determining whether temporal proximity alone may create an inference of retaliation is "essentially fact-based ... depending ... on how proximate the events actually were, and the context in which the issue came before us").  The Third Circuit has not established a bright line rule for the requisite temporal proximity for the causation prong.  It has, however, provided guidance that "where 'the temporal proximity is not so close as to be unduly suggestive,' we have recognized that 'timing plus other evidence may be an appropriate test ....'"  *Id.* (quoting *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003)).  Two days between the protected activity and the adverse employment action has been found sufficient.  *See Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989).  And a three-week gap considered in conjunction with the record as a whole was enough to demonstrate an unusually suggestive temporal proximity.  *See Thomas*, 351 F.3d at 114.  Periods longer than this have consistently been found insufficient to establish the causation element.  *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (concluding that a gap of three months, without more, was not enough to create an inference of causality); *Andreoli v. Gates*, 483 F.3d 641, 650 (3d Cir. 2007) (holding that a five-month period, without additional evidence, was insufficient to raise an inference of causality).

McDonough argues that Conklin "has failed to establish that there was a causal connection between the protected activity and the adverse employment action."  (ECF No. 46, p. 10). McDonough specifically highlights that Conklin's contentions rest on her speculation alone, that she has previously been unsuccessful in her pursuit of the inventory management specialist and prosthetic representative positions prior to her EEO activity, and she fails to adduce evidence that any decision maker in the hiring process knew of her EEO activity.  (*Id.* at 10–11).  In response,

Conklin argues that she has sufficiently established the requisite causal connection because she was informed of her non-selection for the inventory management specialist position "fifteen days after she filed her ORM complaint and twenty-five days after the HPP investigation concluded that Dalmagro had harassed her," both of which are protected activities. (ECF No. 57, pp. 19–20). She also points to the "condoned harassment" that she "was required to endure after her initial protected activity" to demonstrate causality. (*Id.* at 20, 22).

The Court finds that the temporal proximity between Conklin's protected activity and her non-selection for the position alone, both the fifteen days and the twenty-five days in between, is not unusually suggestive of a retaliatory motive. *See McLaughlin v. Fisher*, 277 F. App'x 207, 218 (3d Cir. 2008) (timing alone "ordinarily is insufficient to demonstrate a causal link unless the timing is 'unusually suggestive' of retaliatory motive.") Consequently, the Court must look to other types of circumstantial evidence that may give rise to the inference of causation. The record is devoid of any evidence of a pattern of animus during the interval between Conklin filing her EEO complaints and her non-selection for the inventory management specialist position. There is no evidence that anyone involved in the hiring process of this position knew of Conklin's EEO activity. (ECF No. 47, ¶¶ 31–32, 34–37); (ECF No. 58, ¶¶ 31–32, 34–37). No inconsistent reasons were given to Conklin as to why she was not selected. No evidence was submitted that McDonough treated other employees who engaged in EEO activity differently. Moreover, Conklin's own self-serving deposition testimony and the limited evidence in the record are insufficient to establish a genuine dispute over whether McDonough did not select her for the inventory management specialist position because of her EEO filings.

The Court holds that Conklin also fails to establish the causation element.[7]  Therefore, the Court will grant summary judgment in favor of McDonough on Conklin's Title VII retaliation claim.

## IV.    CONCLUSION

For the reasons set forth above, the Court will grant McDonough's Motion (ECF No. 45), and it will enter judgment in his favor.  Orders of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

---

[7] Even if Conklin met her initial burden under the *McDonnell Douglas* framework and established a *prima facie* case, the record shows a legitimate non-retaliatory reason for her non-selection. *See Carvalho-Grevious*, 851 F.3d at 257 (citation omitted).  Conklin applied for the inventory management specialist position within the Butler VA's logistics department. (ECF No. 47, ¶¶ 29–30); (ECF No. 58, ¶¶ 29–30). Since 2000, she had been working in the pharmacy. (ECF No. 47, ¶ 2); (ECF No. 58, ¶ 2).  The successful applicant for the open position was a man who already worked in the logistics department and had veteran's preference.  (ECF No. 47, ¶¶ 29–30); (ECF No. 58, ¶¶ 29–30); (ECF No. 60, ¶ 39); (ECF No. 63, ¶ 39).  Therefore, if the burden were shifted to McDonough, the Court finds that he would be able to sufficiently meet it.  The burden would then shift back to Conklin "to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Moore*, 461 F.3d at 342 (citation omitted).  Conklin does not point to anything to create a genuine issue of material fact as to the explanation's veracity or that retaliation was the real reason for her non-selection.  Rather, Conklin explicitly agrees with McDonough's recitation of the reasons she was not offered the inventory management specialist position.  Accordingly, she would still fail to establish the causation prong.